**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 1:04cr421** |
| | ) | |
| REX B. WINGERTER, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION**</u>

In this multi-defendant, multi-count prosecution for immigration document fraud,

defendant Rex Wingerter moves for the release of certain of his funds that were subjected to

pretrial restraint at the government's request as substitute assets subject to forfeiture upon

conviction, pursuant to 21 U.S.C. § 853(e)(1)(A).  Wingerter claims these are untainted funds he

inherited from his great aunt and he now needs the money to pay his lawyer and other costs of his

defense in this case and to pay his living expenses.  It appears from the record, however, that

Wingerter has yet to establish the initial showing required for a hearing to challenge the

restraining order and seek release of these restrained funds.  In disposing of Wingerter's motion,

therefore, it is appropriate to clarify (i) the legal basis for the pretrial restraint of substitute assets,

(ii) the nature of the initial showing that is required to obtain a hearing to challenge the

restraining order in whole or in part, and (iii) if this showing is made and a hearing is warranted,

the further showing Wingerter must make to win release of all or some of the restrained funds.

I.[1]

The government has indicted seven co-conspirators in an alleged scheme to submit false

_____

[1] The following recitation of facts is derived chiefly from the Indictment, and
supplemented with information from the parties' pleadings and statements in the course of oral
argument.

labor certifications to the United States Department of Labor ("DOL").[2]  All seven co-conspirators were either employees of, or affiliated with, Global Recruitment and Immigration Services, Inc. ("Global"), a Virginia corporation headquartered in Falls Church, Virginia.  A substantial part of Global's business involved assisting aliens seeking permanent residence in the United States to obtain "green cards" through an employment-based visa program.  In essence, the alleged scheme involved charging aliens significant sums of money in return for which Global and the co-conspirators would submit false applications for labor certification to the government on their behalf to enable the aliens to obtain immigrant visas and, ultimately, permanent residence status.

A brief description of this process is in order.  An alien seeking to immigrate to or remain in the United States may apply for an immigrant visa to perform skilled or unskilled labor in the United States.  Before an employment-based visa will issue, the Secretary of Labor must certify that there are insufficient U.S. workers willing and qualified to perform the labor in question and that the employment of the alien will not adversely affect the wages and working conditions of U.S. workers similarly employed.  Thus, an essential element of the labor certification process is the employer's representation that there are no U.S. workers willing and able to fill the vacant position.  More specifically, to obtain a labor certification, the alien's prospective employer must file an Application for Alien Employment Certification (Form ETA 750) with the DOL through a

---

[2] An eighth co-conspirator, Paul V. Mederos, entered a separate plea of guilty to, among other crimes, conspiracy to commit immigration fraud in connection with the scheme alleged in this Indictment.  *See United States v. Mederos*, Case No. 1:04cr314 (E.D. Va. July 26, 2004) (Plea Agreement).

state employment agency.[3]  And, in this application, the prospective employer must state under

penalty of perjury that it needs and is prepared to employ the applicant and that it has sought, but

not found, U.S. workers willing and able to fill the position.  If the DOL approves the Application

and issues a certification, the prospective employer may then file an Immigrant Petition for Alien

Worker (Form I-140) with the Department of Homeland Security ("DHS").[4]  If approved, the

petition results in the issuance of an immigrant visa allowing the alien to enter into or remain in

the United States and to apply for lawful permanent residence.

      According to the Indictment, defendants and their co-conspirators, operating through

Global, prepared and submitted to the DOL numerous fraudulent ETA 750 applications falsely

indicating that various employers had vacant positions they had tried and failed to fill from the

available U.S. workforce.  In fact, however, these companies had no need for additional workers,

nor did they have any intention of hiring the aliens named on the applications.  Further, in some

instances, to establish that the positions could not be filled from the available U.S. workforce, the

co-conspirators placed fake advertisements in newspapers for various positions setting

unnecessarily restrictive qualifications designed to discourage applicants.  And even if qualified

U.S. workers nonetheless applied for these positions, they were turned away.

      The Indictment describes several examples to illustrate the operation of the conspiracy.

Thus, according to the Indictment, defendants and their co-conspirators submitted approximately

---

[3] The Indictment alleges that false labor certifications were filed with state employment
agencies in Virginia, Maryland, and New Jersey.

[4] On March 1, 2003, the newly-established DHS succeeded to the duties and functions of
the Immigration and Naturalization Service ("INS").  Although many of the fake applications
were submitted to the INS, for purposes of clarity, both agencies are referred to herein as DHS,
the successor agency.

250 fraudulent ETA 750 applications naming East Coast Fabricators, Inc. ("ECF"), a residential

construction business, as the sponsoring employer and claiming that ECF intended to hire

hundreds of aliens in various residential construction trades.  In fact, according to the Indictment,

ECF had no need for these wo          rkers and was laying off U.S. workers during the same time

period.  Defendants and their co-conspirators also allegedly submitted 80 fraudulent ETA 750

applications naming Two Brothers Unlimited ("TBU") as the sponsoring employer, claiming that

TBU had also failed in its effort to hire U.S. workers for various residential construction trades

when, in fact, TBU had only three employees at the time and was not hiring.  Similarly,

defendants and their co-conspirators allegedly filed 390 fraudulent ETA 750 applications naming

Cleaners of America ("COA"), a janitorial services company, as the sponsoring employer.  These

applications claimed that COA planned to hire each alien as a cleaning supervisor in a full-time

position and that COA had tried and failed to find U.S. workers to fill these positions.  The

Indictment alleges, however, that COA had no need to hire these aliens, nor any intention of

doing so.

　　　According to the Indictment, defendant Wingerter was Global's general counsel and

played a significant role in the conspiracy.  Specifically, the government alleges that Wingerter

signed hundreds of the fraudulent ETA-750 applications, knowing that the representations made

in these forms were false.[5]  Over the course of the four-year period alleged in the Indictment,

Wingerter claims he received approximately $189,000 from his work at Global, most of which he

apparently no longer has in his possession.

　　　On March 9, 2005, a grand jury in the Eastern District of Virginia returned a second

---

[5] On these labor certification forms, Wingerter represented, improbably, that he was
serving as counsel for both the company seeking to employ the alien and the alien.

superseding indictment (the "Indictment")[6] naming Wingerter and other defendants in multiple

counts of immigration fraud in violation of 18 U.S.C. § 1546(a) and one count of conspiracy to

commit immigration fraud in violation of 18 U.S.C. § 371.  The Indictment also names (i) all

defendants in one count of conspiracy to encourage aliens to enter the United States unlawfully,

in violation of 8 U.S.C. § 1324(a)(1)(A)(I) & (B)(1)), (ii) defendant Wingerter in one count of

misprision of felony, in violation of 18 U.S.C. § 4, and (iii) various defendants other than

Wingerter in multiple counts of money laundering and conspiracy to commit money laundering,

in violation of 18 U.S.C. §§ 1956(a) & (h), and conspiracy to defraud the United States in

violation of 18 U.S.C. § 371.  Also included in the Indictment is a criminal forfeiture count,

reflecting the grand jury's finding of probable cause to believe that upon the conviction of

defendants on the conspiracy and immigration fraud and money laundering charges, a sum equal

to at least $4,500,000 will be subject to forfeiture as proceeds of those offenses.  The Indictment

further provides for forfeiture of any substitute property up to the value of the amount described,

$4.5 million, in the event the tainted property subject to forfeiture cannot be located because of

any act or omission of the defendants.

On the government's motion, a restraining order issued on March 10, 2005 pursuant to

21 U.S.C. § 853(e)(1)(A) to restrain property or other interests subject to forfeiture, including

substitute assets, to ensure their availability for forfeiture upon conviction of the defendants

named in the Indictment.  *See United States v. Balsirov, et al.*, Case No. 1:04cr421 (E.D. Va.

---

[6] The original single-count indictment issued on October 28, 2004 and named only defendant Bemba Balsirov with conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371. The first superseding indictment issued on February 10, 2005, naming three additional defendants, including Wingerter, in multiple counts.  The second superseding indictment issued on March 9, 2005, naming all seven defendants.

Mar. 10, 2005) (Restraining Order).[7]  Currently included among the restrained assets is a Bank of America Account owned by Wingerter containing approximately $102,000, all of which Wingerter claims is directly traceable to an inheritance he received from his great aunt after her death.  The government does not dispute the alleged source of the funds, but claims instead that because it has not been able to locate and restrain the entire $4.5 million sum forfeitable on conviction, the $102,000 are subject to pretrial restraint as "substitute property."  *See* 21 U.S.C. § 853(p).  In response, Wingerter claims that without these funds, he has little or no funds to pay his lawyers and defense costs and that he and his family face serious financial problems as a result of the Indictment.  Specifically, he has lost his main source of revenue – his income from Global – and he has suffered reduced income as a solo legal practitioner because clients have been reluctant to retain him in light of the Indictment.  Because of his reduced income, Wingerter has not been able to contribute to his family's expenses, which, according to Wingerter, total nearly $9,500 per month, more than twice his wife's monthly salary of $4,400.  Given this, Wingerter claims that without access to the $102,000 he inherited, he is unable to pay either his lawyers and costs of defense or his monthly living expenses.

The parties sensibly sought to reach some mutually satisfactory resolution of this issue. Yet, unable to reach an accord with the government on the release of any portion of the $102,000 to pay living expenses and legal fees, Wingerter filed the instant motion seeking release of these funds.  He argues that his inherited funds are not directly traceable to the alleged immigration

---

[7] On February 11, 2005, a restraining order issued to restrain the property subject to forfeiture upon conviction of the four defendants named in the first superseding indictment, including Wingerter.  *See United States v. Balsirov, et al.*, Case No. 1:04cr421 (E.D. Va. Feb. 11, 2005) (Restraining Order).  A second restraining order, superseding the first, issued on March 10, 2005 following the return of the second superseding indictment on March 9, 2005.

fraud and thus should not be restrained because they are not "tainted assets."  Unless these funds

are released from restraint, Wingerter claims, he will be deprived of his Sixth Amendment right

to a lawyer of his choice.  Moreover, he argues that even if these assets are eligible to be

restrained, there is, in any event, judicial discretion to permit the release of these untainted funds

and that this discretion should be exercised in this case given Wingerter's "minor" role in the

alleged conspiracy.

According to the government, it has been able to locate and restrain only a small fraction

of the $4.5 million that allegedly will be subject to forfeiture upon conviction as proceeds of this

conspiracy.  Given this, the government claims it is entitled to restrain the $102,000 as substitute

property to prevent the dissipation of these funds prior to trial.  To release these funds, the

government argues, would permit Wingerter to spend what may be the government's money to

fund his criminal defense and his living expenses.

## II.

Criminal forfeiture is a creature of statute and is among the penalties provided for

immigration fraud.  Indeed, Congress has enacted a comprehensive scheme for forfeiture in this

context.  Specifically, 18 U.S.C. § 982 provides that a defendant convicted, *inter alia*, of a crime

of immigration fraud in violation of 18 U.S.C. § 1546, or a conspiracy to commit such a crime,

must forfeit to the United States (i) any "proceeds" of the fraud, (ii) any property "derived from

or ... traceable to the proceeds" of the fraud, (iii) any property "used to facilitate" this crime, and

(iv) "any conveyance, including any vessel, vehicle, or aircraft used in the commission of the

offense of which the person is convicted ... ." *See* 18 U.S.C. § 982(a)(6)(A)(i) & (ii).

Collectively, these asset categories are typically referred to as "tainted assets," *i.e.*, assets related

in any way to the immigration fraud offense.

Section 982 does not define the full set of forfeitable property, nor does it provide the procedures for forfeiture.  Instead, § 982(b) accomplishes both of these by expressly incorporating 21 U.S.C. § 853 (except subsection (d)).[8]  Thus, the procedures for seizure and disposition of assets subject to forfeiture under § 982 are found in § 853.  And, more importantly for purposes of the instant case, § 853(p) expands the set of property subject to § 982 forfeiture to include "substitute property," as well as tainted property.  Congress foresaw that circumstances might arise where, through an act or omission of a defendant, the government would not be able to locate tainted assets sufficient to equal the total amount of forfeitable property.  Specifically, a defendant might dissipate, conceal, or spend in whole or in part the tainted, and thus forfeitable, assets.  In such circumstances, Congress, through § 853(p), has provided that other property of a defendant, *i.e.*, substitute property, is also subject to forfeiture up to the value of the forfeitable tainted assets made unavailable by an act or omission of a defendant.[9]

Congress also anticipated that forfeiture would be an ineffective penalty if defendants were free to dissipate, waste, or conceal potentially forfeitable assets prior to trial.  Thus, § 853

---

[8] Congress explicitly declined in § 982(b) to incorporate § 853(d), which establishes a rebuttable presumption favoring forfeiture if the United States establishes by a preponderance of the evidence (i) that the property was acquired by the defendant during the period of the criminal violation or within a reasonable time thereafter, and (ii) that there was no likely source for the property other than the criminal violation.  *See* 21 U.S.C. § 853(d).  Instead, with respect to § 982 forfeitures, the government must establish by a preponderance of the evidence, without the benefit of a rebuttable presumption, that the property is subject to forfeiture either as tainted assets or substitute property.

[9] Subsection (p) provides for the forfeiture of property "up to the value of" tainted property that has been made unavailable through an act or omission of the defendant.  *See* 21 U.S.C. § 853(p); *In re Restraint of Bowman Gaskins Fin. Group*, 345 F. Supp. 2d 613, 622 n.20 (E.D. Va. 2004) (reasoning that substitute property may only be restrained up to the value of the unavailable tainted property); *United States v. Faulk*, 340 F. Supp. 2d 1312 (M.D. Ala. 2004).

   
provides for pretrial, and indeed even pre-indictment,[10] restraint of forfeitable assets to preserve

their availability for forfeiture post-conviction.  More specifically, upon the filing of an

indictment charging a violation of a crime listed in § 982 and alleging that certain property, in the

event of conviction, will be subject to forfeiture, "the court may enter a restraining order or

injunction ... or take any other action to preserve the availability of property *described in*

*subsection (a) of this section* for forfeiture under this section."  21 U.S.C. § 853(e)(1) (emphasis

added).

While this provision makes clear that Congress intended to provide for the pretrial

restraint of certain assets subject to forfeiture, it is less clear whether the authority to restrain

forfeitable assets pre-trial extends to substitute assets, as well as to tainted assets.  This question

has occasioned much litigation.  Circuits courts that have addressed this issue generally have

concluded that substitute property described in § 853(p) is not subject to pretrial restraint because

§ 853(e)(1) is restricted to property "described in subsection (a)," which describes only tainted

---

[10] Certain other assets were restrained in this case pre-indictment after the government
established a "substantial probability" that these other assets would be subject to forfeiture as
property "used to facilitate" visa fraud under 18 U.S.C. § 982(a)(6)(A)(ii)(II), as property
"involved in" or "traceable to" money laundering under 18 U.S.C. § 982(a)(1), or as substitute
assets of the visa fraud and money laundering pursuant to § 853(p).  *See Bowman Gaskins*, 345 F.
Supp. 2d 613.  Property may be restrained before an indictment has issued after the interested
parties have been given notice and an opportunity for a hearing, and once the government
establishes (i) that there is a "substantial probability" that the United States will prevail on the
issue of forfeiture, (ii) that in the absence of pre-indictment restraint, the property likely will be
destroyed, removed, or otherwise made unavailable, and (iii) that the need to preserve the
availability of property outweighs the hardship on any party against whom the order is to be
entered.  *See* 21 U.S.C. § 853(e)(1)(B).  While these findings were made, as required, when
property was restrained in this case pre-indictment, where, as here, the government seeks to
restrain property pre-trial, but post-indictment, these additional findings are not required. Instead,
property may be restrained post-indictment if the indictment alleges that the property with respect
to which the restraining order is sought would be subject to forfeiture in the event of conviction.
*See* 21 U.S.C. § 853(e)(1)(A).

assets.[11]  *See United States v. Field*, 62 F.3d 246, 249 (8th Cir. 1995) (refusing to permit pretrial restraint of substitute assets under § 853(e)(1)); *United States v. Ripinksy*, 20 F.3d 359, 363-64 (9th Cir. 1994) (same); *United States v. Gotti*, 155 F.3d 144, 148-50 (2d Cir. 1998) (refusing to permit retrial restraint of substitute assets under 18 U.S.C. § 1963); *In re Assets of Martin*, 1 F.3d 1351, 1359 (3d Cir. 1993) (same).  The Fourth Circuit, by contrast, stands alone among the circuits in holding that the government may seek pretrial to restrain not only tainted assets, but substitute property as well.[12]  In reaching this conclusion, the Fourth Circuit has reasoned that § 853(e)(1), and a virtually identical forfeiture provision in the RICO context, must be construed broadly "in conjunction with [their substitute asset provisions]" to preserve the availability of all forfeitable assets pending trial, including substitute assets.  *See Billman*, 91 F.2d at 920; *Bowman Gaskins*, 345 F. Supp. 2d at 625; *Wu*, 814 F. Supp. at 493; *Swank*, 797 F. Supp. at 501.  This reading of the statute, in the Fourth Circuit's view, is consistent with Congress' intention that these statutes be "liberally construed to effectuate [their] remedial purposes," which include preserving the defendant's assets for ultimate forfeiture in the event of conviction by thwarting any efforts to avoid the impact of a criminal forfeiture through dissipation of those assets,

---

[11] When Congress incorporated substantially all of § 853 into § 982, it must have intended for the definitions of tainted property subject to forfeiture provided in § 982 to supplant those provided for drug-related crimes in 21 U.S.C. § 853(a). Thus, when § 853(e) provides for the pretrial restraint of assets subject to forfeiture under "subsection (a)," it plainly includes, at least, all tainted assets as defined in § 982.

[12] *See In re Billman*, 915 F.2d 916, 920 (4th Cir. 1990) (upholding pretrial restraint of substitute assets under virtually identical RICO forfeiture provision, 18 U.S.C. § 1963(d)(1)(A)); *Bowman Gaskins*, 345 F. Supp. 2d at 621, 625 (restraining substitute assets pre-indictment and reasoning that neither § 853(e)(1) nor § 853(e)(2) should be read to exclude substitute assets from pretrial restraint); *United States v. Wu*, 814 F. Supp. 491, 493 (E.D. Va. 1993) (applying *Billman*'s rationale to uphold pretrial restraint of substitute assets under RICO forfeiture provision and § 853(e)(1)); *United States v. Swank,* 797 F. Supp. 497, 501 (E.D. Va. 1992) (holding that § 853(e)(1) authorizes pretrial restraint of substitute assets).

whether substitute or tainted, pre-conviction. *Billman*, 915 F.2d at 920 (quoting *Rusello v. United States*, 464 U.S. 16, 26-27 (1983)); *see also United States v. McHan*, 345 F.3d 262, 271 (4th Cir. 2003); 21 U.S.C. § 853(o).  Consistent with its reading of § 853(e) as including substitute assets in the category of assets subject to pretrial restraint, the Fourth Circuit has also read the powerful relation-back provision in § 853(c) to apply to substitute assets.[13]  Thus, although the rule is otherwise in other circuits,  it is well-settled in the Fourth Circuit that upon application of the United States and upon the filing of an indictment charging a criminal violation listed in § 982, all property subject to forfeiture, including any substitute assets, may be restrained pretrial pursuant to § 853(e)(1).

It is also well-settled that pretrial restraint of property, when there is probable cause to believe that it will be subject to forfeiture, does not violate a defendant's Sixth Amendment right to counsel, even if the restraint of these funds makes it impossible for him to pay and retain his chosen lawyer.[14]  As the Supreme Court has made clear, the government's strong interest "in obtaining full recovery of all forfeitable assets ... overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Caplin & Drysdale v. United States*, 291 U.S. 617 (1989).  Thus, to preserve the availability of these assets for forfeiture upon conviction, they may be restrained pretrial without offending a defendant's

---

[13] Section 853(c) provides that "all right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section." 21 U.S.C. § 853(c). Although the text of  § 853(c) also appears to limit the application of the relation-back principle to subsection (a) tainted assets, the Fourth Circuit has read this provision broadly to apply to all assets subject to forfeiture, including substitute property.  *See McHan*, 345 F.3d at 270 (4th Cir. 2003).

[14] Of course, if a defendant is rendered indigent by the pretrial restraint of his forfeitable property, a lawyer may be appointed for him.  *See* 18 U.S.C. § 3006A.

constitutional rights so long as there is a finding of probable cause to believe that they are subject to forfeiture.[15]  This sensible conclusion follows because, as the Supreme Court has noted, "it would be odd to conclude that the Government may not restrain property ... based on a finding of probable cause when we have held that (under appropriate circumstances), the Government may restrain *persons* where there is a finding of probable cause to believe that the accused has committed a serious offense."  *Monsanto*, 491 U.S. at 615-16 (emphasis in original).  Thus, because a forfeiture count in an indictment reflects the jury's finding of probable cause to believe that certain property will be subject to forfeiture upon conviction, pretrial restraint of those assets does not violate a defendant's Sixth Amendment right to counsel.

Given the statutory scheme that authorizes the pretrial seizure of forfeitable assets based on the grand jury's probable cause finding, and given the Fourth Circuit's rule that this authority extends to substitute assets, the question then arises whether an indicted party, whose funds have been seized pretrial as assets subject to forfeiture on conviction, may challenge the seizure and, if so, what such an indicted party must show to succeed on a such a challenge.  In the Fourth Circuit this question is largely answered by *United States v. Farmer*, 247 F.3d 800, 804 (4th Cir. 2001).  While there is no Sixth Amendment right to use property subject to forfeiture to fund his defense, *Farmer* teaches that under certain circumstances a defendant does have a constitutional right to use *nonforfeitable* property to pay a lawyer and the costs of defense.  *See Farmer*, 247 F.3d at 804 (holding that defendant "still possesses a qualified Sixth Amendment right to use

---

[15]  *See United States v. Monsanto*, 491 U.S. 600, 615-16 (1989) ("[I]f the government may, post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial.").

wholly legitimate funds to hire the attorney of his choice"); *Billman*, 915 F.2d at 922  (holding

that pretrial restraint of substitute assets, which are "not nonforfeitable assets," did not infringe

Sixth Amendment right to counsel).  Yet, before a defendant may argue that nonforfeitable

property has been restrained, he must first demonstrate that he is entitled to a hearing at which to

do so.  On this point, *Farmer* holds that due process requires that a defendant be afforded an

adversarial hearing to determine whether assets have been unlawfully restrained only if he can

first establish that he is "without funds to hire the attorney of his choice."  *Farmer*, 247 F.3d at

804.  If the defendant is not able to make this threshold showing, then his private interest in

obtaining his counsel of choice is outweighed by the government's interests, including the

government's interest in avoiding the administrative burden that an additional hearing requires.

*See id.* (applying three-factor test for identifying dictates of due process established in *Mathews v.*

*Eldridge*, 424 U.S. 319, 334-35 (1976)).[16]  If a defendant can establish this threshold showing,

however, then he may request a hearing at which he will be required to prove "by a

preponderance of the evidence that the government seized [nonforfeitable] assets without

---

[16] The Supreme Court held in *Mathews* that when identifying the specific requirements of
due process, three factors must be considered: (1) "the private interest that will be affected by the
official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures
used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3)
"the Government's interest, including the ... administrative burdens that the additional or
substitute procedural requirement would entail.  424 U.S. at 334-35.
        Not decided here is whether a defendant's private interest in using any nonforfeitable
assets to pay his living expenses, as opposed to using them to fund his legal defense, would
trigger a due process right to a hearing to challenge the property's restraint.  It is unnecessary to
decide this question here because if a defendant, like Wingerter, cannot pay his monthly living
expenses, he almost certainly can establish that he does not have the money to pay the attorney of
his choice, and thus will be entitled to a hearing under *Farmer*.

probable cause." *Id.* at 805.[17]

III.

These principles, applied here, point persuasively to the following conclusions.  First, Wingerter's $102,000 in inherited funds has been appropriately restrained pre-trial as substitute property subject to forfeiture upon conviction (i) because the grand jury has found probable cause to believe that $4.5 million will ultimately be subject to forfeiture as "proceeds of" the alleged immigration fraud[18] and property "involved in" money laundering,[19] (ii) because Wingerter, as an alleged co-conspirator in the immigration fraud conspiracy, is jointly and severally liable for all property he derived from the conspiracy and all other property derived from the conspiracy as long as it is reasonably foreseeable to him,[20] (iii) because it appears that the government, despite

---

[17] Neither raised nor decided here is whether a third party who claims an interest in restrained property may challenge the property's restraint pretrial, although it should be noted that in this circuit "[t]hird parties are barred by the [criminal forfeiture] statute from attempting to establish their interest in property subject to forfeiture until an order of forfeiture has been entered."  *See United States v. Reckmeyer*, 836 F.2d 200, 203 n.1 (4th Cir. 1987) (noting that 21 U.S.C. § 853(n) provides the only means for third parties to establish their interest in forfeited property).

[18] *See* 18 U.S.C. § 982(a)(6)(A).

[19] *See* 18 U.S.C. § 982(a)(1).  Notably, while the Indictment does not name Wingerter or some of the other defendants in the money laundering counts, the forfeiture count identifies a total sum of $4.5 million that is subject to forfeiture as "proceeds of" immigration fraud *and* property "involved in" money laundering.  *See* 18 U.S.C. § 982(a)(1) & (a)(6)(A).  Thus, Wingerter may argue at a *Farmer* hearing, if he is entitled to one, that he cannot be held liable for the entire sum named in the Indictment.  In other words, because Wingerter is not accused of money laundering, his property may not be restrained as substitute property for tainted assets of money laundering, but only as substitute property for tainted assets of immigration fraud.

[20] *See United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996) (holding that criminal forfeiture liability is not limited to property a defendant derived individually but includes all property the defendant derived from those acting in concert with him); *United States v. Bollin*, 264 F.3d 391, 419 (4th Cir. 2001) (holding that defendant convicted of money laundering was liable in forfeiture for any foreseeable forfeitable assets possessed by his co-conspirators).

-14-

diligent efforts, has been able to locate and restrain tainted assets that amount to only a small fraction of the $4.5 million, and (iv) because the government is entitled to restrain substitute property pretrial provided that the total property restrained, including tainted assets, does not exceed the $4.5 million subject to forfeiture.  Nonetheless, Wingerter may challenge the restraining order reaching his inherited funds (i) if he can show that he is entitled to a *Farmer* hearing because, without the release of this bank account, he does not have the money to retain the attorney of his choice, and (ii) if, at that hearing, he can "prove by a preponderance of the evidence" that the government has restrained property without probable cause to believe that it will be subject to forfeiture upon conviction.  *See Farmer*, 274 F.3d at 805.

While it appears from the unsworn assertions in his pleadings that Wingerter's monthly debts exceed his monthly income and that substantially all of his assets have been restrained, he has not yet offered any formal proof in the form of properly admissible evidence that he is without funds to pay his lawyer.  If Wingerter can make this threshold showing, he will be entitled to a *Farmer* hearing.[21]

In the event that Wingerter can establish that a *Farmer* hearing is warranted, he may win the release of his inherited funds by proving that the government has restrained his property without probable cause to believe that it will be forfeitable, either as tainted or substitute property, if he is convicted.  More specifically, Wingerter could win release of the $102,000 by establishing by a preponderance of the evidence (i) that there is no probable cause to believe that he committed the immigration fraud and conspiracy to commit immigration fraud crimes charged

---

[21] Of course, at a *Farmer* hearing, the government may also present evidence that Wingerter has other substantial assets with which to hire an attorney.  *See Farmer*, 274 F.3d at 805.

in the Indictment, or (ii) that a portion of the $4.5 million the grand jury found would be subject

to forfeiture is subject to forfeiture as tainted property of money laundering, and not tainted

property of immigration fraud, and that the government has restrained more in tainted and

substitute assets than it has probable cause to believe will be subject to forfeiture as tainted assets

of immigration fraud,[22] or (iii) that the government has already restrained an amount in tainted

and substitute assets that exceeds the amount of property that Wingerter reasonably could have

foreseen would be subject to forfeiture either by him or as a result of the immigration fraud

conspiracy.[23]

IV.

Wingerter offers two arguments in an effort to avoid the conclusion that his inherited

funds are subject to pretrial restraint.  Neither argument is persuasive.  First, Wingerter argues

that pretrial restraint of his inherited funds, because they are untainted, substitute assets, violates

his Sixth Amendment right to counsel.  In support of this argument, Wingerter relies on the

statement in *Farmer* that while there is no Sixth Amendment right to obtain counsel using

"*tainted* funds," a defendant does have a qualified right to pay for his criminal defense with funds

that the Fourth Circuit referred to alternatively as "wholly legitimate funds" and "untainted

assets."  *Id.* at 804, 805 (emphasis added).  This reliance is misplaced.  Significantly, post-

*Farmer* Fourth Circuit precedent makes clear that the key distinction for determining whether

pretrial restraint of property violates a defendant's Sixth Amendment right is not whether the

property it is *tainted* or *untainted*, but rather whether it is *forfeitable* or *nonforfeitable*.  In

---

[22]  *See supra* note 19.

[23]  *See McHan*, 101 F.3d at 1043; *Bollin*, 264 F.3d at 419.

*Billman*, the Fourth Circuit pointedly avoided the distinction between tainted and untainted assets, and held specifically that substitute assets, like all property subject to forfeiture (or "contraband assets"), may be restrained pretrial without infringing a defendant's Sixth Amendment right to counsel. *See Billman*, 915 F.2d at 922 (substitute assets are "not nonforfeitable assets. They are ... substitute assets, which § 1963 subjects to forfeiture ").[24] Thus, all forfeitable property, including substitute property, may be restrained pretrial without violating a defendant's Sixth Amendment right; it is nonforfeitable property that may not be restrained. And while Wingerter is entitled to challenge the government's conclusion that his inherited funds will be forfeitable as substitute assets if he is convicted, he must first establish that he is entitled to a *Farmer* hearing at which to do so.

Second, Wingerter argues that, even if he has no constitutional right to spend the restrained funds, there is judicial discretion to tailor the restraining order to permit the expenditure of these funds in view of (i) his "minor" role in the conspiracy and (ii) his desire to spend the money to fund his legal defense and to pay his monthly living expenses. Specifically, he notes that § 853(e)(1) provides not that the court "shall," but that the court "*may* enter a

---

[24] Similarly, the Fourth Circuit in *McHan* explicitly rejected the argument that the relation-back principle applies only to "tainted property" and not to "innocent" § 853(p) substitute property. *See* 345 F.3d at 270-71. It follows that because the relation-back principle applies to all property subject to forfeiture whether tainted or untainted, including substitute property, a defendant does not have a Sixth Amendment right to spend substitute property that will belong to the government if he is convicted on his legal defense. To conclude otherwise would encourage a shrewd defendant who has already dissipated or concealed all tainted assets to spend his remaining untainted, substitute assets on high-priced defense lawyers. In doing so, he would further diminish the funds available to the government for forfeiture upon conviction. Thus, the controlling rule in the Fourth Circuit is not that tainted funds may be restrained pretrial, while untainted assets may not, but that all property subject to forfeiture, including substitute assets, is subject to pretrial restraint to preserve its availability post-conviction.

restraining order or injunction, require the execution of a satisfactory performance bond, or take

any other action to preserve the availability of property ... for forfeiture under this section." 21

U.S.C. § 853(e)(1) (emphasis added). Yet, the Supreme Court has already rejected this

permissive reading of § 853(e)(1) as it "seriously misapprehends the nature of the provisions in

question." *See Monsanto*, 491 U.S. at 613. In *Monsanto*, the Supreme Court reasoned that under

§ 853(e)(1), a district court's discretion to refuse the government's request for a restraining order

is strictly limited; this discretion extends only to *how* the forfeitable assets should be preserved

for forfeiture, *i.e.*, by injunction, bond, or restraining order, but not to *whether* such assets should

be preserved. *See id.* at 612-13. In other words, a district court has discretion to employ means

other than a restraining order, such as an "injunction" or "bond," but it is not free to do nothing

with respect to forfeitable property; instead, a district court, on the government's motion, must

take some action, "to preserve the availability of property described in subsection (a) of this

section for forfeiture." 21 U.S.C. § 853(e)(1). To conclude otherwise, reasoned the Supreme

Court, would be to give the district court "discretion to permit the dissipation of the very property

that § 853(a) requires be forfeited upon conviction."[25] *Id.* at 612-13. Further, the Supreme Court

in *Monsanto* reasoned that construing § 853(e)(1) as conferring discretion to permit a defendant

to spend forfeitable funds on his legal expenses would effectively nullify the powerful relation-

back provision in § 853(c). *See id.* ("Permitting a defendant to use assets for his private purposes

---

[25] While the Supreme Court in *Monsanto* considered the restraint of tainted property described in § 853(a), the district court may no more exercise its discretion to permit the dissipation of substitute property that has vested in the United States pursuant to § 853(c) and must be forfeited upon conviction pursuant to § 853(p) than it has discretion to permit the dissipation of tainted assets that must be forfeited pursuant to § 853(a). *See McHan*, 345 F.3d at 270-271 (holding that relation-back doctrine applies to § 853(p) substitute assets).

that, under this provision, will become the property of the United States if a conviction occurs cannot be sanctioned.").  In sum, then, there is no discretion to permit a defendant to spend assets that are subject to forfeiture, including substitute assets.  They must be preserved for forfeiture.

To be sure, the statute may seem draconian in this regard.  Indeed, the Supreme Court even recognized that the statute may lead to results that "may seem harsh." *Id.* at 613.  Yet, as the Supreme Court also recognized, this is precisely what the statute requires and it is the province of Congress, not the courts, to amend the statute if the results ultimately seem undesirable.  *See id.*  Thus, because there is no other obvious way to preserve these substitute assets for forfeiture and because Wingerter has not suggested any alternative, there is no discretion to modify the restraining order to permit their expenditure on his legal or living expenses.

For these reasons, because Wingerter has not yet made the threshold showing required for a *Farmer* hearing, his current motion must be denied.  Yet, he has leave to file a new motion to establish the threshold showing required for a *Farmer* hearing if he can do so consistent with Rule 11, Fed. R. Civ. P.   If he establishes this threshold showing, he will be entitled to an adversarial hearing where he may demonstrate by a preponderance of the evidence that the government has restrained his property without probable cause to believe it will ultimately be subject to forfeiture as tainted assets, substitute assets, or otherwise.

An appropriate order will issue.


_____/s/_____
Alexandria, Virginia                                        T. S. Ellis, III
May 17, 2005                                                 United States District Judge


-19-